[No. 1945.]

## The Krippendorf-Dittman Company et al. v. Trenoweth et al.

1. SALES—CHATTEL MORTGAGES—FRAUD.

Where a merchant transferred his stock of goods to the president of a bank in satisfaction of a debt due the bank, and in further consideration of certain other debts of the merchant assumed by the bank, and made to the vendee an absolute bill of sale of the property, the fact, that, as the vendee sold the goods he paid the proceeds to the bank, and upon the debts assumed by the bank, proportionately until the assumed debts were paid and the bank received the amount of the debt of the merchant satisfied by the transfer, does not stamp the bill of sale with the character of a chattel mortgage for the security of the debts and is not inconsistent with an absolute purchase and is no evidence of a fraudulent purpose.

2. SALES—BOOK ACCOUNTS—CONSIDERATION—EVIDENCE.

Where a merchant transferred his stock of goods, fixtures, etc., in payment of certain debts owed by him and made a bill of sale to the vendee, particularly specifying the property transferred, and in which no mention was made of his book accounts, to sustain a transfer of the book accounts as against unsecured creditors, it must be shown that the accounts were transferred as a part of the same transaction witnessed by the bill of sale and for the same consideration or else that the transfer was based upon a new and separate consideration.

3. SALES—BOOK ACCOUNTS—FRAUDULENT TRANSFERS—ACCOUNTING.

Where an insolvent merchant transferred his stock of goods in payment of certain debts and it appears that his book accounts which were not mentioned in the bill of sale and for which no consideration was paid were transferred to the vendee and a large amount of money collected thereon by the vendee, the creditors of the merchant are entitled to an accounting by the vendee to ascertain what sums were collected on the accounts, and what other sums were not collected which by reasonable diligence might have been.

4. CONTRACTS—PAROL AND WRITTEN—SEPARATE INSTRUMENTS.

A contract may rest partly in writing and partly in parol, or in two instruments in writing executed contemporaneously, and relating to the same subject-matter.

*Error to the District Court of Gilpin County.*

Mr. C. M. KENDALL, for plaintiffs in error.

Mr. H. M. ORAHOOD and Mr. CHASE WITHROW, for defendants in error.

THOMSON, J.

In July, 1897, Charles Trenoweth, a merchant doing business in Central City, being unable to meet his obligations, and being indebted to The Rocky Mountain National Bank in the sum of $6,000, and to certain other parties in sums aggregating $7,350, executed to Thomas H. Potter, the president of the bank, the following instrument in writing:

" Know all men by these presents, that I, Charles Trenoweth, of Central City, Colorado, in consideration of the sum of thirteen thousand three hundred and fifty dollars ($13,350) to me in hand paid by Thomas H. Potter, of same place, the receipt whereof I do hereby acknowledge, have sold, assigned, transferred and set over, and do hereby sell, assign, transfer and set over to said Thomas H. Potter, all my stock of goods, wares and merchandise, clothing, gents' furnishing goods, hats, caps, trunks, valises, show cases, two iron safes, counters, tables, shelving, one cash register, electric light fixtures, settees, desk and all other furniture and fixtures, all now in the two stores occupied by said Charles Trenoweth on west side of Main street south of and adjoining the First National Bank, in block No. 1, in said Central City, Gilpin county, Colorado, to have and to hold unto the said Thomas H. Potter, his heirs and assigns, forever.

" Witness my hand and seal, this 27th day of July, 1896.
    Signed,        " CHAS. TRENOWETH.    (Seal)."

Upon the execution of the foregoing instrument, the bank surrendered to Charles Trenoweth the note evidencing part of his indebtedness to it, and credited him with the amount of his overdraft, in which the remainder consisted. In part consideration of the transfer, Potter also assumed the outside indebtedness of $7,350, and agreed to pay it. He

thereupon took possession of the chattels, and by himself and his agent, H. Jacob Kruse, made sales from the property until January 21, 1897, when Potter sold the residue to Kruse for $4,200, taking his note for the amount. Kruse continued the business of selling the goods, replenishing the stock by the purchase of new goods, until April 19, 1897, when he sold what remained on hand to Josiah Paulglaze for $5,000. Paulglaze thereupon organized a corporation called The Central Shoe & Clothing Company, to which he transferred the property in consideration of its issue to him of its entire capital stock, represented by 20,000 shares.

The proceeds of sales of goods, and money realized on the note of Kruse, were, from time to time, turned over to the bank and the creditors whose claims had been assumed, proportionately, until each of those creditors was paid in full, and the bank received the amount, principal and interest, of Charles Trenoweth's note in cash.

On the 21st day of July, 1896, Charles Trenoweth, being indebted to his brother, Thomas H. Trenoweth, upon a promissory note made by him on the 21st of March, 1891, in the sum of $1,000, conveyed to the latter, in payment of the note, an undivided one-third interest in the East Centennial lode mining claim, in Gilpin county.

The Krippendorf-Dittman Company and the Giesecke Boot & Shoe Manufacturing Company, creditors of Charles Trenoweth, whose claims had been reduced to judgment, and executions in whose favor had been returned wholly unsatisfied, brought this action against Charles Trenoweth, Thomas H. Potter, The Rocky Mountain National Bank, H. Jacob Kruse, Thomas H. Trenoweth and The Central Shoe & Clothing Company, to set aside the several transfers of the goods, fixtures, etc., and the conveyance of the mining interest, praying that the property and the moneys collected, be subjected to the payment of their judgment, and praying also for an accounting of the proceeds of the goods sold, and moneys received to the use of Trenoweth, alleging that the transfers

and conveyance were fraudulent to the knowledge of every participant in the transaction, and were colorable merely, and made for the purpose of hindering and delaying the unpreferred creditors of Trenoweth. The complaint also alleged that, as part of the transaction between Charles Trenoweth and Potter, the former transferred to the latter book accounts to the amount of $10,000, half of which were collectible, with the same general purpose of defeating just claims against him. The court, after hearing the evidence, found that the transaction evidenced by the bill of sale was an absolute sale, without taint of fraud, and that the conveyance to Thomas H. Trenoweth was made in good faith. The judgment was for the defendants, and the plaintiffs prosecute error.

Before the several transactions of which we have spoken were closed, Brown Brothers & Company, creditors of Charles Trenoweth, caused a writ of attachment to be issued in a suit brought by them against him, and served process in garnishment upon Potter. On the issue made by a traverse of the answer of the garnishee, a trial was had, resulting in a judgment for the latter. The case was brought here by writ of error. *Brown v. Potter*, 13 Colo. App. 512. It was contended then, as it is now, that the transactions were fraudulent as to creditors, but upon an examination of the record, it was our opinion that the sale to Potter was absolute, and made in good faith for an adequate consideration; and, accordingly, we sustained the judgment below. No transaction was considered in that case except the sale of the goods, furniture and fixtures. The decision there is relied upon by counsel for the defendants as conclusive here; but, as we shall see hereafter, there is an element in this case which did not appear in that, and which marks a distinction between the two that renders the other valueless as an authority in the present controversy.

The form of the instrument by which the chattels were transferred, is that of an absolute bill of sale; the consideration it expresses was the sum total of the debt to the bank

and the debts which were assumed; the evidence would hardly justify a conclusion that the real value of the goods was substantially in excess of the amount allowed for them; there was nothing unlawful in the nature of the transaction; and both parties to it affirmed an honest intent. The transfer of the mining interest was without visible badge of fraud. Charles Trenoweth owed his brother, and satisfied the debt by the conveyance. The consideration does not seem to have been inadequate. Indeed, the evidence leaves us in doubt whether the property conveyed was worth the debt. As to the principal facts, the witnesses testified in open court; there was evidence to warrant the findings; and if nothing were involved but the transfer of the goods, furniture and fixtures, and the conveyance of the mining interest, we should not be at liberty to disturb the judgment.

But it is contended that the circumstances of the transaction stamp upon the bill of sale the character of a mortgage, and indicate that the property, instead of being sold in consideration of Trenoweth's discharge from the specific debts, was delivered as security for the debts. Upon the proposition that the fact of taking an absolute bill of sale of property, and attempting to set it up as a purchase when in fact it was a mere security for a debt, is evidence of a fraudulent purpose, we have no quarrel with counsel. But we do not think such theory of the case is borne out by the facts. It is true that when Potter received the merchandise, he proceeded to sell it and apply the proceeds upon the debts he had assumed, except a *pro rata* share which he turned over to his bank; and it is also true that this is what he would, probably, have done if he had taken the property as security; and yet, his proceeding was in no wise inconsistent with an absolute purchase. There is nothing preposterous in the supposition that having, for the purpose of saving his own claim, or rather the claim of the bank, purchased goods, and, as part of the consideration for the purchase, promised to pay other debts of the vendor, he should endeavor to make the goods pay the debts, and, at the same time, yield the money

for the bank. While the hypothesis of an absolute sale is not contradicted by the payment of the preferred debts and the realization of the bank's money from the proceeds of the property, one fact appears which unanswerably contradicts the theory of security. The debt from the vendor to the bank was discharged. His note was surrendered to him, and his overdraft balanced. The cancellation of the whole debt was the result of the transfer. That a transaction by which a debt was paid should be a security for its future payment, is a contradiction of terms,—a palpable absurdity.

But, connected in some manner with the sale of the goods and other articles to Potter, was a transfer of book accounts of a face value approximating $10,000, to the same party. In the joint answer of Potter and the bank, the transfer of the book accounts to the former is admitted; and in his testimony, Potter stated that he bought the accounts. Kruse testified that as agent of Potter, and for himself after he purchased the stock, he collected on those accounts, $3,671, and that he turned the uncollected demands over to Mr. Paulglaze upon the sale of the goods to him. It also appears that Paulglaze transferred them to the company he organized. It is inferable from Potter's answer and from his testimony, that he intended it to be understood that the chattels and the accounts were bought together; that their sale and transfer to him constituted but one transaction and that the consideration of the purchase of both was the same. The possession of the book accounts cannot be thus explained. Upon the evidence here, they were not transferred to him together with the other property, and the consideration of the purchase of that property was not the consideration of their purchase. Potter's purchase of the merchandise, fixtures and furniture, was evidenced by a written bill of sale, executed by Charles Trenoweth. No book accounts passed by that instrument. It describes the property intended to be transferred so specifically, that nothing else can be included, even inferentially. And it was in consideration of the transfer to him of that particular property, and no other, that Mr. Potter agreed to cancel the indebted-

ness of Trenoweth to the bank, and pay the claims of the other preferred creditors. The assignment of the accounts was, therefore, of necessity, a different transaction, supported, if supported at all, by a different consideration. But no separate consideration was claimed for it; and in so far as the record throws any light on the subject, this transfer was made without any consideration whatever. A large sum of money was collected on the accounts while they were in the hands of Potter and Kruse; and presumably something was realized on them after they were turned over to the corporation, but upon their history after they left the hands of Kruse, the record is silent. Here is something into which these plaintiffs have a right to inquire. The matter was not probed to the bottom; and what was disclosed would seem to warrant the conclusion that money for which Potter is responsible, and perhaps the bank also, was realized from accounts to which neither Potter nor the bank, nor their assignees, had any right as against the unprotected creditors. No allusion to these demands appears in the findings of the court.

Upon the evidence as we have it, an accounting should have been ordered to ascertain what sums were collected, and by whom; and what other sums were not, which, by the exercise of reasonable diligence, might have been; and unless at the next trial a valid contract of which the bill of sale is a part, shall be shown, from which it shall appear that the accounts and the merchandise, furniture and fixtures, were sold together for the same consideration, it will be the duty of the court to order the accounting, and when it shall be had, to enter the proper judgment. A contract may rest partly in writing and partly in parol, or in two instruments of writing executed contemporaneously, and relating to the same subject-matter; but to enable the court to say that the accounts were included in the sale, it must appear that all the property, merchandise, furniture, fixtures and accounts, were transferred by the same contract.

The judgment is reversed.

*Reversed.*